UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHNATHAN WALKER,

        Petitioner,

    v.

SHAWN HATTON,

        Respondent.

No.  2:18-cv-2492 JAM DB P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his conviction imposed by the Solano County Superior Court in 2013 for first degree murder.  Petitioner alleges ineffective assistance of counsel and racial discrimination in jury selection.  For the reasons set forth below, this court will recommend the petition be denied.

## BACKGROUND

### I.  Facts Established at Trial

The California Court of Appeal for the First Appellate District provided the following factual summary:

#### FACTUAL AND PROCEDURAL BACKGROUND

The Solano County District Attorney filed an information charging defendant with first-degree murder, with a related allegation that he personally used a firearm in the commission of the murder of

1

Michael Ross on June 23, 2011. The following evidence was presented during a jury trial held approximately two years later in October 2013.

### A. Prosecution's Case

On June 23, 2011, at 4:10 p.m., Vallejo Police Detective Mark Nicol responded to shots fired in the parking lot at an apartment complex in Vallejo. Arriving at the scene, Detective Nicol found the victim lying on the ground in a parking stall. The victim was pronounced dead at the scene. The parties stipulated the cause of death was multiple gunshot wounds to the victim's body. At trial the prosecution presented several witnesses who were present at the shooting: Charles Ambeau (the victim's cousin), Courtney Ross (the victim's sister), Charles G., and LaToia Lemar.

On the day of the shooting, after celebrating the victim's birthday elsewhere, Charles Ambeau and the victim drove to the apartment complex in the victim's car. After the car was parked, both men exited the car. Ambeau, who was standing near where the victim parked his car, saw a man approaching from his right. Ambeau then heard the victim yell, "Oh shit, grab my gun."[fn 2] Ambeau turned and saw an armed man running toward them. The armed man was wearing a hat, a short-sleeved shirt, "sagging pants, and he did not have any tattoos on his arms...."[fn 3] Ambeau saw the gunman for "not even a second" and did not get a good look at his face. As Ambeau ran, he fell to the ground and heard several gunshots. He looked up from the ground and saw the side of the gunman's face for less than one second before the gunman ran away.

At trial Ambeau testified that when he saw the gunman he immediately knew it was defendant, whom he knew by his childhood nickname John–John. Ambeau had previously seen defendant once or twice in person and had seen pictures of defendant on the internet and social networking sites. Ambeau was also aware defendant and the victim had fought each other approximately a year before the shooting, but he did not see the fight. Before he spoke to the police, Ambeau heard the victim's sister tell the police the gunman was John–John. When interviewed by the police, Ambeau lied and said he did not know and could not identify the gunman. The police showed Ambeau several photographs and he identified defendant and one other man as possibly looking like the gunman. Ambeau explained he had lied to the police because he did not want to get involved in the incident. The police knew Ambeau had lied about the identity of the shooter because Ambeau told his father what transpired when the victim was shot and his father told the police what Ambeau said.

Courtney Ross and her friend Lance were in the vicinity of the apartment complex, when she observed the victim drive his car toward the carport area of the complex. Ross observed the victim park his car and, from a distance of at least 45 feet, she saw a man approach with his arm extended. Ross did not get a clear look at the man's face. She was not wearing her glasses, which made things "clearer," so the man was "just a figure" to her. She did see the side

profile of the man, and John–John was the first name that popped into her head. She asked Lance, "Is that John–John?" Lance said, "No," "That's not John–John." Ross thought the man was John–John by his walking style, even though defendant was much bigger, and had put on more weight, than she recalled when she saw him five years earlier. Ross observed the man, with his right arm extended, standing near the victim's car. She did not see a gun in the man's hand or notice any tattoos on his arms. Then she heard seven or eight gunshots, but she did not see the man when she heard the gunshots or after he fired the gun. Ross screamed when she heard the gunshots and ran from the parking lot into her mother's apartment. She phoned her mother and said, "Michael's been shot."[fn 4] The police arrived several minutes after the gunshots were fired and Ross spoke with them. Later at the police department, officers showed Ross a series of photographs. She identified defendant as the man she observed with his arm extended in the parking lot. Ross was 100 percent certain that defendant was the person she had seen.

Charles G. was at the apartment complex when he saw a man, walking quickly, aiming a "clip gun" at the victim's car. Charles G. did not get a good look at the gunman and could not identify him. He described the gunman as 19–20 years old and approximately 5′10″ tall. The gunman was walking bent over, and held his belt buckle with his hand, because his pants were "sagging." Charles G. then heard four gunshots. The gunman ran away in the same direction from which he had approached.

LaToia Lemar was sitting on the carport wall at the apartment complex as the victim parked his car in the carport. Two occupants got out of the car. Neither person who got out of the car had a gun. She then saw a man, armed with a handgun, running towards the victim's parked car. The gunman was "scrunched down, like trying to be sneaky," as he approached the victim's car. Lemar heard gunshots; "[t]he first shots rang out. There was pop, pop, and then it stopped, and then it was like two or three more shots after that." Lemar was certain that all the gunshots came from the same person because there was nobody else there that could have had a gun. After hearing the first gunshots, Lemar looked away and "everyone started yelling, 'Get down, get, down.' " Lemar did not see the victim get shot. Immediately after the gunshots ended, Lemar heard the passenger who got out of the car earlier yell, "He got shot. He got shot.' " She also heard the gunman say something to the victim like, "Told you I'd get you," or "I got you," or "That's what you get." Lemar was not able to identify defendant as the gunman. However, she described the gunman as an African–American man in his late teens, early 20s and he was wearing a hat and a short-sleeved white T-shirt. She did not recall any scars or marks on the gunman's arms.

Vincent Ramirez, a delivery truck driver, also testified on behalf of the prosecution. He was sitting outside his truck, which was parked outside of the apartment complex on the day of shooting. Ramirez did not observe any construction crews in the area. At some point, he saw a tannish gold Honda pull up and park in the red zone near his truck. He heard a car door open and close. Ramirez then saw an African–American man, in his late teens or early 20's, cross the street

and jog toward the apartment complex. The man was holding up his blue jeans pants. Approximately five seconds later Ramirez heard several gunshots. After the third or fourth gunshot, the driver of the Honda, an African–American woman, made a u-turn and parked behind Ramirez's truck. Ramirez then saw the same man he had previously seen now jogging at a faster pace while holding up his pants. The man jumped into the passenger seat of the Honda and then the woman behind the wheel drove away. Ramirez used his tablet to record the Honda's license plate number. He was certain he saw the numbers "802," and he recorded more than "802," but was unable to record the entire license plate number.[fn 5] Within an hour of the shooting, Ramirez spoke with the police and gave them the license plate number that he had recorded on his tablet and a description of the clothing worn by the man he had seen. Approximately three weeks later, the police showed Ramirez a car, which he identified by make and license plate number, as the car he had seen on the day of the shooting.

Defendant's former girlfriend Tiffini Alexander testified under a grant of use immunity. On the day of the shooting she owned and was driving the Honda that was seen by Ramirez. She had driven defendant to the apartment complex because he said he wanted to buy some marijuana there. Once at the apartment complex, Alexander heard a loud noise that sounded like construction equipment—drilling "and like someone was banging a hammer ...." As defendant left the car and walked normally across the street and into the apartment complex, Alexander continued to hear the ongoing construction noise. Approximately five minutes later defendant returned to the car, walking normally. He got into the car and he was not out of breath. He showed her some marijuana when he got into the car. Alexander drove defendant to his friend's house.

Later that evening Alexander attended a party where she spoke with her friend S.L. S.L. said "some stuff that she had heard that was going on." While still at the party, Alexander received a telephone call from defendant. She denied defendant told her he had "served" the victim or had killed anyone. Rather, Alexander testified that defendant said that "other people" were saying he had "shot the boy," and "it happened out of [her] car."[fn 6] He was concerned about going to jail based on false accusations. He told her not to drive her car because they "needed to clear it up first." Alexander honored defendant's request and did not drive her car. Alexander left the party, met defendant, and they spent two days at the home of Alexander's aunt. During their time together, defendant told Alexander he injured his leg when he jumped off a balcony at the apartment complex trying to avoid some unnamed guys who were about to jump him. The injury left a scar on defendant's leg.

Alexander was extensively examined regarding the inconsistencies between her trial testimony and her earlier statements to the police and at the preliminary hearing. Alexander explained she had given inconsistent statements because several weeks after the shooting, she was arrested by the police. She was taken to the police department where she was questioned by City of Vallejo Detective John Garcia and Police Officer Mathew Mustard. The police had not told her why

4

she had been arrested. She was read her Miranda rights and agreed to talk to the police officers about the shooting. The police officers informed Alexander they had spoken to her friend S.L. and S.L. told the police about a conversation between S.L. and Alexander, during which Alexander said defendant had admitted he shot the victim.[fn 7] When asked to explain why she had agreed that she told S.L. about defendant's admission, Alexander stated the police coerced her by telling her she could be charged with murder, or as an accessory to murder, because she had given defendant a ride in her car. The officers also told Alexander she would lose her children if she did not cooperate, and, her children did not need their mother to go to prison. "[T]hey kind of had me believing that that was true, so I agreed to it." At trial Alexander admitted she also told the police, during the interview, that defendant described how he shot the victim in the head and in the leg because "that's when they were saying they were going to take my kids and stuff." However, she was telling the truth when she told the police about defendant's explanation of how he sustained an injury to his leg when he was forced to jump off a balcony to avoid being jumped by "some guys" in the apartment complex. Alexander could not recall if she told the police that defendant said he got his leg injury during a fight with the victim.[fn 8] Jurors were then shown a two-hour redacted videotape of Alexander's interview with the police, and given a 218–page redacted transcript to aid them in viewing the tape.[fn 9] On cross-examination, Alexander acknowledged her testimony at trial was contrary to her earlier statements because she did not "honestly ... believe" defendant had shot the victim. On the day of the shooting Alexander never saw defendant in possession of a gun. When he walked toward the apartment complex he was walking normally and not like someone who was going to shoot someone, and when he returned to the car he was walking normally and did not act like someone who had actually shot someone.

City of Vallejo Police Officer Mustard testified concerning his interview of Alexander.[fn 10] He testified that during the interview with Alexander, he asked her about her children because he wanted her to understand the issues she was facing "when it [came] to jeopardy." He admitted he told her she had "a lot to lose," and she had to make a choice between her loyalty to her children and her loyalty to defendant.

Thaddeus Brewer, the victim's stepfather, testified concerning two incidents that occurred before the shooting. One incident occurred at the apartment complex approximately a year to a year and a half before the victim was shot. On this particular afternoon the victim was acting very nervous and afraid. That evening "most likely after 9:00 [p.m.]," the victim went to the parking lot of the apartment complex. Brewer followed and saw the victim running after a man. The victim and the man started to fist fight, throwing punches at each other. It looked like the victim was "winning" the fight, causing Brewer to intervene and separate the two men. Brewer did not recall or notice any injuries sustained by the man who fought with the victim. Brewer did not get a good enough look at the man who fought with the victim to recognize the man if he saw him again.

5

Brewer also testified about a second incident that occurred after the first incident. The second incident occurred approximately two to three months before the victim was shot. In this second incident, Brewer was assaulted by a man as he (Brewer) stepped out the door of his workplace. Brewer did not recognize his assailant. Brewer heard his assailant say, "What's up now, ...? Do you remember that night? Do you remember me and Michael?" Hearing the assailant's words, Brewer recognized the man as the person who had earlier fought with the victim at the time when all three men were present. Brewer secured, from his workplace, a printout of a video of the altercation to learn the name of his assailant. Brewer showed the printout of the video to the victim. The victim told Brewer the name of Brewer's assailant.

### B. Defense Case

Defendant called as a witness Robert Shomer, a forensic or experimental psychologist, who was qualified as an expert in memory perception and eyewitness identification. According to Shomer, eyewitness identifications were approximately 50 percent accurate, and could be impacted by various factors including the presence of a weapon, the distance and prospective at which the eyewitness viewed the perpetrator, the eyewitness's receipt of information from others, and whether and when the eyewitness had previously seen the perpetrator. Shomer further testified that the accuracy of an eyewitness identification was not necessarily supported by the eyewitness's certainty of identification or a prompt report of the identification.

> [fn 2] Ambeau testified he lied to the police and told them that the victim did not have a gun on the day of the shooting. However, at trial, Ambeau admitted that the victim had a gun in his car that day.

> [fn 3] Defendant's former girlfriend, Tiffini Alexander, testified defendant had tattoos on both shoulders and on his forearms between his elbows and his shoulders. She did not know the size of the tattoos. If defendant wore a tank top, his tattoos would be visible as they were "a fairly dark color." If defendant wore a "short-sleeved shirt," like the one Alexander wore in court, defendant's shoulder tattoos could not be seen but the ones on his forearms would be visible.

> [fn 4] At trial Ross did not remember if she told her mother who shot Michael. Janine Jones, the mother of the victim and Ross, testified that while she was at work she received a telephone call from Ross. Ross said, "Mama, Michael's been shot by John–John." Jones also remembered Ross saying, "I saw it, it was John–John."

> [fn 5] City of Vallejo Detective John Garcia testified as to the full license plate number on the Honda, which included "802."

////

6

[fn 6] During Alexander's testimony, the court admonished the jury that Alexander's testimony as to what "other people" said was not offered to prove the truth of the statements, but merely to explain Alexander's state of mind, and her answers and any information provided to her by defendant.

[fn 7] Alexander testified that before she had been arrested the police went to see S.L. S.L. later told Alexander that the police were going to arrest Alexander because she was a murderer and they were going to take her children. S.L. asserted she never saw what happened and she had only told the police things that she had heard "off the street" about the shooting.

[fn 8] According to the transcript of Alexander's statement, in response to a question as to whether defendant said the victim had caused the injury to defendant's leg, Alexander said defendant "just said that the dude had ... him and the dude had got into it or something. I don't even know what that was about. He just said that the dude—they had an altercation. And they jumped him or something.... I think he said they jumped him. They jumped him. And, ... the dude was running around saying that he was going to kill him...." When asked if defendant said who jumped him, Alexander said, "He just said the dude and some other dudes. He didn't ever name them or nothing."

[fn 9] At the request of defense counsel, the videotape and transcript were redacted to omit certain statements that the court ruled were inadmissible and, according to defense counsel, to omit "other inflammatory statements made by the police in direct relationship to their attempt to get this information from Ms. Alexander." The transcript was not admitted into evidence, but was marked as a court exhibit.

[fn 10] City of Vallejo Detective Garcia testified he was also present during Alexander's interview. However, neither the prosecutor nor defense counsel questioned the witness regarding what transpired during the interview.

People v. Walker, No. A143349, 2017 WL 4325339, at *1-4 (Cal. Ct. App. Sept. 28, 2017).

## II. Procedural Background

### A. Judgment and Sentencing

A jury convicted petitioner of the first degree murder of Michael Ross in violation of Penal Code § 187. The jury also found true an allegation that petitioner personally used a firearm during the commission of the murder. At a bifurcated proceeding, the trial court found true an allegation that petitioner had a prior robbery conviction, which constituted a serious

////

7

1    felony and a strike within the meaning of the Three Strikes law.  Cal. Penal Code §§ 667;

2    1170.12.  The court sentenced petitioner to a total term of 80 years to life in state prison.

3          **B.  State Appeal and Federal Proceedings**

4          Petitioner, represented by counsel, filed an appeal.  He raised claims regarding the

5    prosecutor's exercise of a peremptory challenge against a prospective African American juror, the

6    admission of certain evidence, and his trial counsel's failure to move to exclude evidence.  On

7    September 28, 2017, the California Court of Appeal for the First Appellate District affirmed the

8    conviction and sentence.  <u>Walker</u>, 2017 WL 4325339.  The California Supreme Court

9    subsequently denied a petition for review.  (Ex. 11 to Answer (ECF No. 19-5 at 272).)

10          Petitioner then filed a petition for a writ of habeas corpus in the Court of Appeal.  He

11    raised one claim - ineffective assistance of counsel for the failure to move to suppress Tiffini

12    Alexander's statement to police.  (Ex. 12 to Answer (ECF No. 19-5 at 276-306).)  The Court of

13    Appeal denied the petition, stating that because petitioner's appeal was no longer pending, he

14    must first seek habeas relief in the superior court.  (Ex. 13 to Answer (ECF No. 19-5 at 308).)

15          Petitioner then filed a petition for a writ of habeas corpus in the California Supreme Court.

16    (Ex. 14 to Answer (ECF No. 19-15 at 311-84).)  On March 21, 2018, the California Supreme

17    Court denied the petition without comment.  (Ex. 17 to Answer (ECF No. 19-5 at 416).)

18          Petitioner filed the present federal habeas petition on September 13, 2018.  (ECF No. 1.)

19    Respondent filed an answer (ECF No. 18) and lodged the state court record (ECF Nos. 19 and

20    22).  Petitioner filed a traverse.  (ECF No. 27.)

21          **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

22          An application for a writ of habeas corpus by a person in custody under a judgment of a

23    state court can be granted only for violations of the Constitution or laws of the United States.  28

24    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

25    application of state law.  <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502

26    U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000).

27    ////

28    ////

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id. at 1451.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06).  "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

9

1    governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that

2    principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

3    (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A]

4    federal habeas court may not issue the writ simply because that court concludes in its independent

5    judgment that the relevant state-court decision applied clearly established federal law erroneously

6    or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

7    see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not

8    enough that a federal habeas court, in its independent review of the legal question, is left with a

9    firm conviction that the state court was erroneous." (Internal citations and quotation marks

10   omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

11   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

12   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

13   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

14   state prisoner must show that the state court's ruling on the claim being presented in federal court

15   was so lacking in justification that there was an error well understood and comprehended in

16   existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

17        There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693

18   F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

19   supported by substantial evidence in the state court record" or he may "challenge the fact-finding

20   process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox,

21   366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.

22   2014) (If a state court makes factual findings without an opportunity for the petitioner to present

23   evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

24   to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel,

25   applying the normal standards of appellate review," could reasonably conclude that the finding is

26   supported by the record.  Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

27        The second test, whether the state court's fact-finding process is insufficient, requires the

28   federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

1   finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

2   process was adequate."  Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d

3   943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

4   automatically render its fact finding process unreasonable.  Id. at 1147.  Further, a state court may

5   make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

6   or where petitioner's factual allegations are entirely without credibility."  Perez v. Rosario, 459

7   F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

8        If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews

9   the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see

10  also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we

11  may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error,

12  we must decide the habeas petition by considering de novo the constitutional issues raised.").  For

13  the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of

14  28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the]

15  claim in State court proceedings" and by meeting the federal case law standards for the

16  presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S. 170,

17  186 (2011).

18       The court looks to the last reasoned state court decision as the basis for the state court

19  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

20  "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

21  a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

22  reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

23  banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

24  has been presented to a state court and the state court has denied relief, it may be presumed that

25  the state court adjudicated the claim on the merits in the absence of any indication or state-law

26  procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be

27  overcome by showing "there is reason to think some other explanation for the state court's

28  decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 293 (2013).  When it is clear, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

## ANALYSIS

Petitioner raises two claims.  First, he contends his trial attorney was constitutionally ineffective when he failed to move to exclude evidence of Alexander's statement to police.  Second, he argues that the prosecutor's use of a peremptory challenge to excuse an African American venire member violated his right to equal protection of the laws.

## I.  Ineffective Assistance of Counsel Claim

Petitioner argues that the testimony Tiffini Alexander should have been excluded because she had been threatened by police interrogators with the loss of her children if she did not answer their questions.  He argues that his trial attorney was constitutionally ineffective when he failed to move to exclude her statement to police.

### A.  Background Facts for Ineffective Assistance of Counsel Claim[1]

About three weeks after the shooting, the police arrested Alexander for murder, and brought her into the police station for questioning.  (4 RT 903, 926; 5 RT 1093 (ECF No. 19-4 at 134, 157, 331).)  According to Alexander's testimony, the police pulled guns on her and her children, dragged them out of the car, placed her in handcuffs, and put her in the back of a police van.  The children were taken to Alexander's grandmother's.  (4 RT 903, 923-26 (ECF No. 19-4 at 134, 154-57).)

The police interview with Alexander was both audio and video recorded.  (5 RT 1093

---

[1] These facts are taken primarily from the redacted transcript of Alexander's interview that was provided to the jury.  It is Ex. 2 to the Answer.  (ECF No. 19-2.)  Where facts are taken from Alexander's trial testimony, it is noted in the text.  Respondent lodged a copy of the trial transcript as Ex. 5.  (See ECF Nos. 19-3 and 19-4.)

(ECF No. 19-4 at 331).)  Jurors were shown a redacted version of the recordings, and were given a redacted transcript of the interview so that they could follow along.[2]  (See 5 RT 1093-97 (ECF No. 19-4 at 331-35).)

Before the interview, police removed Alexander's handcuffs. Then police read Alexander her Miranda rights.  When they asked her if she knew what the interview was about, she asked if it was about her stolen car.  She told them she had a 1987 gold Honda Accord that had been stolen, but that she did not remember when it had been stolen, and had not reported it because she did not have "information" on it.  She said the car was not registered to her because she had just bought it from a man named "Spud."

The police next asked Alexander for some background information, including her full name, date of birth, and whether she had any children.  Alexander told them she had two daughters, ages one and four.

Officers showed Alexander a picture of a car, and she confirmed that it looked like hers. They also showed her a picture of petitioner, and she confirmed that it was "Johnny," her "ex-boyfriend."

The following exchange then occurred:

> [Detective] Mustard:  Listen to me. You've got a lot to lose.  And this can go one of two ways.  I've done my homework.  I don't drag you in here because your car got stolen.  Feel me?  I don't think you killed anybody.
>
> Tiffini Alexander:  [Nuh-uh.]
>
> [Detective] Mustard:  Okay.  But I can't let you sit here and lie to me either.  I know your car wasn't stolen at least in relationship to what I'm going to ask you about.  You're going to have to make a decision about where your loyalties lie.  I don't expect you to be loyal to me. I don't expect you to be loyal to him.
>
> Uh, you're going to have to make your decision whether you're going to be loyal to him or whether you're going to be loyal to your kids.  You've got a couple young kids that need their mother.  And

---

[2] While both parties state that the jury was provided the "entire" interview in video and transcript form, both the trial court and the appellate court noted that both the video and transcript had been redacted at the request of the defense.  (See 5 RT 1094-95 (ECF No. 19-4 at 332-33); Walker, 2017 WL 4325339, at *3 n.9.)  The copy of the transcript provided to this court as Ex. 2 to the Answer (also identified as Trial Exhibit 1) shows redactions.  (See, e.g., ECF No. 19-2 at 69-74.)

1

if you want to be loyal to this guy, then you're going to spend some time in jail.

2

Tiffini Alexander:  I'm not trying to go to jail at all.  Like I can't afford . . . [t]o go to jail.

3

[Detective] Mustard:  You're right.  So here's your opportunity.  And it's one opportunity.  Tell me what happened that day.

4

5

Detective Mustard told Alexander that he did not want to "misjudge" her loyalty to her

6

children and her "fear" of petitioner.  He told her that once she told him what she knew, they

7

would then talk about what the police could do to keep her safe.  At that point, Alexander began

8

crying, telling officers that she had seen people get "killed" for "doing stuff like that."  Mustard

9

told her that she was the only one who could make these "choices," and that she had to "judge

10

your loyalty to that boy over your loyalty to your children."  When Alexander responded that

11

"[m]y kids come before anybody," Mustard said that she should then be loyal to her children

12

"because the kids need their mama.  And their mama don't need to be going to prison."  He

13

continued that she had to figure out that "if that's my number-one priority, then how the hell do I

14

get myself safe and get my kids safe."  He told her that once she told him what she knew, they

15

would talk about how to keep her safe.

16

When Alexander expressed concern that she could talk to police and still end up being

17

charged, Mustard told her he could not judge her responsibility without knowing what she had to

18

say.  He said the only thing he knew was that petitioner had been identified as the shooter, so he

19

knew that Alexander herself did not shoot the victim.  But he needed to know what she "actually

20

saw. . . actually heard . . . actually kn[e]w" so he could get an idea about whether she was "in

21

trouble or not."

22

Alexander then began to make a statement, saying that she let petitioner use her car.

23

Mustard interrupted her, reminding her he was not going to let her lie to him, and that he was

24

giving her "one chance at this."  Alexander then continued with her statement, saying that

25

petitioner asked her to drive him "to Safeway to go get a sandwich."  As she was driving,

26

petitioner asked her to turn around, because he forgot something.  He then asked her to pull over

27

and park.  Petitioner got out of the car and ran into an apartment complex across the street.  About

28

14

1  five minutes later, he came back at a jog, looking like "nothing happened."  She claimed she

2  "heard no shots or nothing," just a "knocking sound like" "construction work," and thought

3  "nothing of it."  She said she "didn't know what happened until later on that night" when

4  petitioner told her not to drive the car and her cousin told her "somebody got killed in the

5  apartments across the street from Tiara's house and . . . earlier today.  And it was right when you

6  and John-John . . . left."

7      Alexander then expressed concern about having to eventually testify against petitioner.

8  Mustard told her it was likely she would be called to testify.  She also was concerned that she had

9  seen petitioner recently.  Officers then questioned Alexander in an attempt to determine who

10  petitioner was with at that time.

11      The interview continued with questions about what had occurred before Alexander drove

12  petitioner to the apartment complex, what occurred afterwards, and who else had been present

13  during those times.

14      Officers then continued to press Alexander for more specific details about the incident.

15  Alexander maintained the same story throughout her interview and in her preliminary hearing

16  testimony.  (See 4 RT 964-65 (ECF No. 19-4 at 195-96).)

17      At trial, Alexander invoked the Fifth Amendment and was granted use immunity before

18  she testified.  (4 RT 794 (ECF No. 19-4 at 25).)  Her testimony at trial differed significantly from

19  her story to police and her preliminary hearing testimony.  She testified both that the police fed

20  her the story and also that she told them what she had heard on the street.  She testified that she

21  went along with it because they told her she "was going to be charged with murder and that they

22  were going to take away [her] kids" and she was scared.  (4 RT 902-04, 915-18, 952, 964-65,

23  968-69 (ECF No. 19-4 at 133-35, 146-49, 183, 195-96, 198-99)).  However, she did testify that

24  she and petitioner drove to the apartment complex where the murder occurred, petitioner ran into

25  the apartment complex to get marijuana, and about five minutes later he returned to the car and

26  they drove off.  (4 RT 883-91 (ECF No. 19-4 at 114-22).)

27  ////

28  ////

15

### B. Applicable Legal Standards

To succeed on a claim of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." Id. at 687–88 (internal quotation marks omitted). Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112.

A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697), amended and superseded on other grounds, 385 F.3d 1247 (9th Cir. 2004); United States v. Ray, No. 2:11-cr-0216-MCE, 2016 WL 146177, at *5 (E.D. Cal. Jan. 13, 2016) (citing Pizzuto, 280 F.3d at 954), aff'd, 735 F. App'x 290 (9th Cir. 2018).

### C. State Court Decision

In habeas, this court must consider the reasonableness of the highest state court's opinion. 28 U.S.C. § 2254(d). However, the grounds for the state court's opinion are not always immediately evident. In the present case, petitioner first raised this habeas claim in a petition before the California Court of Appeal. That court determined the petition was not properly before it and instructed petitioner to first raise the claim in the superior court. (Ex. 13 to Answer (ECF No. 19-5 at 308).) Instead, petitioner next raised it in a petition filed in the California Supreme Court. The California Supreme Court denied the claim without comment. (Ex. 17 to Answer (ECF No. 19-5 at 416).)

////

1    There are two ways the federal courts consider a silent denial for purposes of § 2254(d).

2    First, on its own, a silent denial is presumed to be a denial on the merits.  Richter, 562 U.S. at 99.

3    However, where there has been a "reasoned" lower court opinion, this court should look-through

4    the silent denial to that reasoned decision.  See Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018);

5    Ylst v. Nunnemaker, 501 U.S. 797, 804-05 (1991).  The Court refers to this doctrine as the "look-

6    through presumption."  Wilson, 138 S. Ct. at 1193.  That presumption may be rebutted "[w]here

7    there are convincing grounds to believe the silent court had a different basis for its decision than

8    the analysis followed by the previous court...."  Id. at 1197.

9    Whether or not the Court of Appeal's decision on petitioner's habeas petition constituted a

10   "reasoned" decision, this court agrees with respondent that the look-through presumption should

11   not apply here.  The record shows that the California Supreme Court had a different basis for its

12   decision than the reasons provided by the Court of Appeal.

13   In Wilson, the Court explained that the look-through presumption could be rebutted where

14         a federal habeas court may conclude that counsel has rebutted the
     presumption on the basis of convincing alternative arguments for

15   affirmance made to the State's highest court or equivalent evidence
     presented in its briefing to the federal court similarly establishing that

16   the State's highest court relied on a different ground than the lower
     state court, such as the existence of a valid ground for affirmance that

17   is obvious from the state-court record.

18   138 S. Ct. at 1196.

19   In the present case, a number of factors lead to the conclusion that the California Supreme

20   Court's denial was not a denial on the same grounds cited by the Court of Appeal.  First, the

21   Court of Appeal stressed that is was declining to consider the habeas petition in the first instance

22   because petitioner's appeal was no longer before it.  That was not the case in the California

23   Supreme Court.  Petitioner's petition for review of the denial of his appeal was pending before the

24   California Supreme Court when he filed his habeas petition on November 20, 2017.  Thus, the

25   rationale behind the Court of Appeal's denial of petitioner's original state habeas petition was

26   inapplicable in the California Supreme Court.

27   Second, the California Supreme Court requested an informal response from respondent.

28   If the California Supreme Court simply felt that petitioner must raise his claims in the superior

1   court in the first instance, then a response was unnecessary.

2          Third, the state's informal response did not argue that petitioner's ineffective assistance of

3   counsel claim was not properly before the California Supreme Court.  Rather, the state's

4   argument focused on petitioner's inability to show he was prejudiced by any unreasonable

5   conduct of his trial attorney in failing to move to exclude Alexander's statement to police.  (See

6   Ex. 15 to Answer (ECF No. 19-5 at 385-98).)

7          For these reasons, this court finds the look-through presumption has been rebutted.  The

8   California Supreme Court's denial of petitioner's claims was most likely based on the merits.

9   Wilson, 138 S. Ct. at 1192 ("[T]he [s]tate may rebut the presumption by showing that the

10  unexplained affirmance relied or most likely did rely on different grounds.").  This court treats it

11  as such in the analysis of plaintiff's ineffective assistance of counsel claim below.

12          **D.  Merits of Ineffective Assistance of Counsel Claim**

13          Petitioner presents evidence showing that his trial attorney was not aware of case law

14  permitting a challenge to the admissibility of Alexander's statement on the grounds that it was not

15  voluntarily.  Therefore, according to petitioner, his trial attorney's failure to move to suppress her

16  statement was not based on strategy.  As the state court most likely did, this court need not reach

17  the issue of counsel's reasonableness because petitioner fails to show prejudice.  Pizzuto, 280

18  F.3d at 955 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of

19  sufficient prejudice . . . that course should be followed.").

20          The first question in the prejudice analysis is whether, had counsel moved to suppress

21  Alexander's statement, there is a reasonable probability the trial court would have granted that

22  motion.  The second question is whether, had Alexander's statement been excluded, there is a

23  reasonable probability that the result of the proceedings would have been different.  Both of these

24  questions must be considered with deference to the California Supreme Court's denial of this

25  claim.

26  ////

27  ////

28

                                            18

**1.  Validity of a Motion to Exclude Alexander's Statement**[3]

A confession is considered involuntary when it is not the "product of a rational intellect and a free will."  Brown v. Horell, 644 F.3d 969, 979 (9th Cir. 2011) (internal citations omitted).  "A 'necessary predicate' to finding a confession involuntary is that it was produced through 'coercive police activity.'  Id. (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).  However, establishing coercive police activity is not sufficient without more to demonstrate a confession was involuntary.  "Whether a confession is involuntary must be analyzed within the 'totality of the circumstances.'  []  The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age."  Id. (quoting Withrow v. Williams, 507 U.S. 680, 694-94 (1993)).

Petitioner relies on three cases.  None compel a conclusion that petitioner's motion would have been successful at trial.  First, in People v. Trout, 54 Cal. 2d 576 (1960), overruled on other grounds by People v. Cahill, 5 Cal. 4th 478 (1993), the defendant was suspected of robbery and kidnaping.  Eight officers entered the defendant's home with guns drawn while he and his wife were watching television and their three children were sleeping.  The officers separated defendant and his wife and questioned them separately.  The defendant was told his wife would be retained until he confessed.  The defendant's wife was sent in twice to talk with him.  "The first time . . . she was crying and told [defendant] she had been informed she could go home if he confessed.  At the second visit she said that she had been taken home for a short while, that the baby cried for her when she left, and that she wanted to go home and 'just couldn't bear it.'"  The defendant's

---

[3] The parties agree that petitioner would have had standing to challenge the admission of Alexander's statement at trial.  Originally, petitioner raised this claim in his appeal.  The Court of Appeal rejected the government's attempt to challenge this claim on those grounds.  See Walker, 2017 WL 4325339, at *11 n. 20 (petitioner had "standing to challenge" the admission of Alexander's allegedly coerced statement "on the ground that the statement was unreliable, thereby depriving him of his own due process right to a fair trial" (citations omitted)).  Petitioner also argues that the California Court of Appeal "effectively" held that Alexander's statement was coerced and, therefore, excludable.  This court can find nothing in the Court of Appeal's opinion indicating that it rendered any opinion, effective or otherwise, on the issue of the voluntariness of Alexander's statement.

1  wife corroborated defendant's version of the interrogations.  54 Cal. 2d at 579-81.  The California

2  Supreme Court found the defendant's confession was coerced.  Id. at 585.  In particular, the court

3  noted that the police "had no grounds" to arrest the defendant's wife.  Id. at 584.

4      The present case is distinct from Trout on several grounds.  Primarily, in Trout, officers

5  were threatening to keep defendant's wife from their children even though they had no grounds to

6  arrest her.  In the present case, Alexander was a suspect in the murder case.  Officers had

7  information that Alexander's car was involved in the murder and that a woman had been driving

8  it.  They also knew she had dated petitioner.  In addition, Alexander was given Miranda warnings.

9  Detective Mustard's warnings that Alexander may not see her children if she was jailed, while

10  certainly upsetting, were also truthful.  Unlike the officers in Trout, officers in the present case

11  did not mislead Alexander.

12      The second case cited by petitioner is Lynumn v. Illinois, 372 U.S. 528 (1963).  In

13  Lynumn, officers arrested the defendant on narcotics charges.  According to the defendant's

14  testimony, officers told her that if she did not confess to selling narcotics, she could get ten years

15  in prison, her children would be taken away, and she would not get them back when she was

16  released.  When she asked what they wanted her to say, officers told her that she had to admit she

17  gave a package of narcotics to a third party.  Not only did the Court hold that the defendant's

18  confession was coerced, but the state conceded that point as well.  372 U.S. at 529-35.

19      In the present case, officers did not give Alexander any specific information about the

20  crime, except to tell her it was murder, they knew that petitioner was the shooter, and they

21  implied Alexander had been driving the car.  They did not provide many of the other details – the

22  date and time or the location.  While Alexander testified at trial that officers told her what to say,

23  nothing in the record before this court supports that testimony.

24      Petitioner's third case is United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981).  In

25  Tingle, police officers questioned the defendant, who was found bound and gagged after a bank

26  robbery.  They accused the defendant and her boyfriend of committing the crime.  The Ninth

27  Circuit found the officers' conduct in interrogating the defendant "patently coercive" because

28  they told her:  (1) that a lengthy prison term, up to 40 years, could be imposed, (2) that she "had a

1   lot at stake," (3) that her cooperation would be communicated to the prosecutor; (4) that her

2   failure to cooperate would be similarly communicated; and (5) "that she might not see her two-

3   year-old child for a while."  Tingle, 658 F.2d at 1336.  The court also noted that the record

4   showed the defendant "felt great psychological stress" during the interrogation because she

5   sobbed, was "noticeably shaking," and "continued to cry for at least ten minutes."  Id. at 1334.

6   The court concluded that the defendant "had every reason to believe, from what she was told, that

7   her confession would have a significant impact on her ability to see her child."  Id. at 1337.  The

8   court focused particularly on law enforcement's deliberate attempt to "prey upon the maternal

9   instinct and inculcate fear in a mother that she will not see her child in order to elicit

10   'cooperation.'"  Id. at 1336. Based on the "totality of the circumstances," the court concluded that

11   "the psychological coercion brought to bear upon [the defendant] produced her confession.  We

12   hold, therefore, that [the defendant's] confession was not 'the product of a rational intellect and a

13   free will' and was involuntary."  Id.

14          Tingle would have provided strong support for a motion to exclude Alexander's

15   statement.  However, Tingle is just one case.  Many other courts have found that the coercive

16   nature of comments about a suspect's children were not, when considering the totality of the

17   circumstances, sufficient to conclude that the suspect's will was overborne.  In fact, the Ninth

18   Circuit noted these cases in 2011 in Brown.  The court recognized that "[o]ther courts considering

19   the effect of leveraging a suspect's familial affections on the voluntariness of that suspect's

20   confession have not unanimously concluded that Lynumn . . . compel[s] a rule that exploiting an

21   accused's relationships to induce cooperation renders the resulting confession involuntary."  644

22   F.3d at 982 (citing United States v. Mendoza–Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992),

23   abrogated on other grounds by Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994); United

24   States v. Charlton, 565 F.2d 86, 88 (6th Cir. 1977); United States v. Jones, 32 F.3d 1512, 1517

25   (11th Cir. 1994)); see also United States v. Hufstetler, 782 F.3d 19, 23-24 (1st Cir. 2015)

26   ("discussion of a family member, on its own, is not per se coercive.  Instead, we must closely

27   examine the specific manner in which the officer discussed the relative and weigh such references

28   against the defendant's susceptibility to coercion."); McCalvin v. Yukins, 444 F.3d 713, 720 (6th

1  Cir. 2006) (court found confession not coerced for a number of reasons, including the facts the

2  defendant signed a Miranda waiver, was sufficiently mature to understand her rights, never

3  requested counsel or to end the interview, was given breaks, and was permitted to call her

4  mother).

5          Further, while Tingle might support an argument that the police questioning of Alexander

6  was coercive, the analysis does not end there.  This court must consider whether, given the

7  totality of the circumstances, was the suspect's will overborne.  In other words, petitioner must

8  show that the coercive conduct caused the defendant to confess.  See Brown, 644 F.3d at 979;

9  People v. Maury, 30 Cal. 4th 342, 404-05 (2003) ("Although coercive police activity is a

10  necessary predicate to establish an involuntary confession, it does not itself compel a finding that

11  a resulting confession is involuntary.  The statement and the inducement must be causally

12  linked."  (internal quotation marks and citations omitted).)

13          And, even if this court found that coercive police conduct caused Alexander to confess,

14  this court must also find that the state court's decision was contrary to or an unreasonable

15  application of clearly established federal law.  This court may only find petitioner has met this §

16  2254(d) standard if the state court's ruling on the claim "was so lacking in justification that there

17  was an error well understood and comprehended in existing law beyond any possibility for

18  fairminded disagreement."  Richter, 562 U.S. at 103.  Therefore, if there was any reasonable basis

19  upon which the California Supreme Court could have rejected petitioner's ineffective assistance

20  of counsel claim, then petitioner may not succeed on it here.

21          This court finds it would have been reasonable for the California Supreme Court to have

22  determined petitioner would not have succeeded on a motion to exclude Alexander's statement.

23  This court recognizes the likely possibility the officers' conduct was intended to coerce

24  Alexander to talk.  They stressed that Alexander would be forced to give up her children if she

25  went to prison.  They framed Alexander's predicament as a choice between being with her

26  children and protecting petitioner.  That said, Alexander was read her Miranda rights and agreed

27  to talk with officers; she never sought to stop the interrogation nor did she ask for counsel; and

28  ////

1   Alexander appeared to understand her choices and expressed reasonable concern that she might

2   talk and still be prosecuted.

3         It is also worth noting that while likely coercive, officers did not mislead Alexander.

4   When she questioned whether she might end up being charged, Mustard did not attempt to

5   reassure her.  Rather, he told her that they could not judge her culpability until they heard her

6   story.

7         Finally, petitioner presents no evidence to show Alexander was particularly vulnerable to

8   coercion.  While the record shows she was clearly upset by the prospect of being charged,

9   potentially convicted of a crime, and being separated from her children, those possibilities would

10  be upsetting to anyone.  The fact that she was in the predicament that many suspects who are

11  parents face when brought in for questioning does not mean her statement was involuntary.  The

12  record does not indicate that she was so emotional that she was unable to decide, on her own,

13  whether or not to talk with officers.

14        This court finds the California Supreme Court could reasonably have denied petitioner's

15  ineffective assistance of counsel claim on the basis that petitioner had not established a

16  reasonable likelihood Alexander's statement would have been excluded.

17                          **2. Effect on the Verdict**

18        Even assuming petitioner could establish that Alexander's statement would have been

19  excluded, he has not shown the California Supreme Court would have been unreasonable in

20  concluding that it was not reasonably probable the verdict would have been different.  At trial,

21  Alexander did not deny that she drove petitioner to the apartment complex, he got out of the car

22  and ran into the complex, and that he returned about five minutes later.  That testimony, along

23  with trial testimony identifying petitioner as the shooter, would have supported a guilty verdict.

24  Petitioner's ineffective assistance of counsel claim should be denied.

25  **II.  Batson Claim**

26        **A.  Applicable Legal Standards**

27        In <u>Batson</u>, the United States Supreme Court held that the Equal Protection Clause

28  prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the

1   basis of race.  Batson v. Kentucky, 476 U.S. 79, 89 (1986).  Wheeler is the California state

2   counterpart to Batson.  People v. Wheeler, 22 Cal. 3d 258, 272 (1978), overruled in part on

3   another ground in Johnson v. California, 545 U.S. 162 (2005); Yee v. Duncan, 463 F.3d 893, 896

4   (9th Cir. 2006).  The Batson standards control the disposition of a petitioner's claim on federal

5   habeas corpus review.  See Lewis v. Lewis, 321 F.3d 824, 827 (9th Cir. 2003).

6        In order to prevail on a Batson claim, a petitioner must first establish a prima facie case of

7   purposeful discrimination.  Batson, 476 U.S. at 96-97; Lewis, 321 F.3d at 830.  "To establish a

8   prima facie case, the [petitioner] must show that 'he is a member of a cognizable racial group,'

9   Batson, 476 U.S. at 96, and that 'the facts and circumstances of the case raise an inference' that

10  the prosecution has excluded venire members from the petit jury on account of their race."

11  McClain v. Prunty, 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting Wade v. Terhune, 202 F.3d

12  1190, 1195 (9th Cir. 2000)).  In deciding whether a petitioner has made the requisite showing, the

13  court should consider all relevant circumstances.  Batson, 476 U.S. at 96.

14       If a prima facie case is made out, "the burden shifts to the State to come forward with a

15  neutral explanation for challenging" the jurors in question.  Batson, 476 U.S. at 97; Stubbs v.

16  Gomez, 189 F.3d 1099, 1105 (9th Cir. 1999).  "The prosecutor's challenges need not rise to a

17  level justifying use of a challenge for cause."  United States v. Power, 881 F.2d 733, 740 (9th Cir.

18  1989) (citing Batson, 476 U.S. at 87-88).  Indeed, for purposes of this step, the prosecutor's

19  explanation need not be "persuasive or even plausible."  Purkett v. Elem, 514 U.S. 765, 768

20  (1995).  Rather, a neutral explanation in this context "means an explanation based on something

21  other than the race of the juror."  McClain, 217 F.3d at 1220 (quoting Hernandez v. New York,

22  500 U.S. 352, 360 (1991)).  "At this step of the inquiry, the issue is the facial validity of the

23  prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's

24  explanation, the reason offered will be deemed race-neutral."  Id. (quoting Stubbs, 189 F.3d at

25  1105).  As with any credibility determination, the trial court's observations are of significant

26  importance.  Batson, 476 U.S. at 98 n. 21; see also Lewis, 321 F.3d at 830.

27       At the final step of this inquiry, "the trial court must determine whether the defendant has

28  carried the burden of proving purposeful discrimination."  McClain, 217 F.3d at 1220 (quoting

1  Hernandez, 500 U.S. at 359); see also Batson, 476 U.S. at 98.  The court must evaluate the

2  prosecutor's reasons and make a credibility determination.  Lewis, 321 F.3d at 830.  A

3  comparative analysis of the struck juror with empaneled jurors "is a well-established tool for

4  exploring the possibility that facially race-neutral reasons are a pretext for discrimination."  Id.  If

5  a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons,

6  then the explanation may be deemed a pretext.  Id.  The proffer of various faulty reasons and only

7  one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an

8  extent that a court should sustain a Batson challenge.  Id. at 831.

9          On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing

10  more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of

11  acceptable invocation of peremptory challenges, so long as they are the actual reasons for the

12  prosecutor's actions."  Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874 F.2d 695,

13  699 (9th Cir. 1989)).

14          Petitioner bears the burden of demonstrating the existence of unlawful discrimination,

15  Batson, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the

16  opponent of the strike," Purkett, 514 U.S. at 768.  However, petitioner "is entitled to rely on the

17  fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection

18  practice that permits 'those to discriminate who are of a mind to discriminate.'"  Batson, 476 U.S.

19  at 96 (quoting Avery v. Georgia, 345 U.S. 559, 662 (1953)).

20          "Because 'it is widely acknowledged that the trial judge is in the best position to evaluate

21  the credibility of the prosecutor's proffered justifications,' due deference must be accorded to the

22  trial judge's determination."  Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013) (quoting

23  Briggs v. Grounds, 682 F.3d 1165, 1171 (9th Cir. 2012)); see also Miller-El v. Cockrell, 537 U.S.

24  322, 339 (2003) (a "state court's finding of the absence of discriminatory intent is 'a pure issue of

25  fact' accorded significant deference"); Sifuentes v. Brazelton, 825 F.3d 506, 515 (9th Cir. 2016)

26  (the "credibility determination relies on the trial court's 'evaluation of the prosecutor's state of

27  mind based on demeanor and credibility,' and is a 'pure issue of fact' that lies 'peculiarly within a

28  trial judge's province' " [citation omitted] ).  "Deference is necessary because a reviewing court,

1    which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to

2    make credibility determinations." <u>Miller-El</u>, 537 U.S. at 339.  "The upshot is that even if

3    '[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, ... on

4    habeas review that does not suffice to supersede the trial court's credibility determination.'" <u>Davis</u>

5    <u>v. Ayala</u>, 135 S. Ct. 2187, 2201 (2015) (quoting <u>Rice v. Collins</u>, 546 U.S. 333, 341-42 (2006)).

6        **B.  State Court Decision**

7            Because petitioner raised his <u>Batson</u> claim on appeal, the decision of the California Court

8    of Appeal is the last reasoned decision of a state court.

9            **A.  Relevant Facts**

10               Before jury selection began, approximately 80 jurors were asked to
                complete written questionnaires consisting of 77 questions. During

11               voir dire, prospective juror D.R., described as an African–American
                woman, was the only African–American juror in a group of 10 jurors

12               initially seated in the jury box. In her juror questionnaire, D.R. stated
                she was currently working as a registered nurse at a CDCR

13               [California Department of Corrections and Rehabilitation] facility,
                with management or supervisory responsibilities. Both counsel

14               questioned D.R. about some of her written responses regarding her
                ability to serve fairly as a juror in a criminal case, her feelings about

15               the criminal justice system, her one positive experience and one
                negative experience with law enforcement, and her knowledge of

16               potential witnesses.

17               The prosecutor used a peremptory challenge to excuse D.R. and
                defendant made a *Batson/Wheeler* motion to set aside the

18               prosecutor's challenge. In support of the *Batson/Wheeler* challenge,
                defense counsel argued that D.R. "had a lot of life experience, and

19               she had some pretty good insight into the burden of proof. The People
                have her responses to [the prosecutor's] questions. I didn't see

20               anything wrong, favoring one side or the other. She emphasized her
                ability to assess the credibility...." Defense counsel added D.R. had

21               "a positive experience with law enforcement and things of that nature
                as well. So I thought she was kind of good for both sides. And so that

22               just leaves the only thing left being race, unfortunately."

23               The prosecutor argued defense counsel had failed to establish a prima
                facie case under *Batson/Wheeler*. Expanding on his position, the

24               prosecutor explained his reasons for excusing D.R., starting "with
                her profession. She works in the prison as an R.N. and she regularly

25               has contact with prisoners.... I'm concerned about that, because th[e]
                nature of that relationship being an R.N., who is taking care of people

26               who are in the prison system, that she would be more sympathetic to
                those individuals. Here, we have an individual who potentially faces

27               the possibility of going to state prison. So under no circumstances
                would I ever want an R.N., who is working at CDC[R] to be sitting

28               on a case like this or any criminal case, for that matter." The

prosecutor was also concerned about D.R.'s written responses to several questions, which he believed called into question her ability to sit as a juror in a criminal case and apply the reasonable doubt standard, further noting that her responses during voir dire had not dispelled his concerns.

The court denied the *Batson/[W]heeler* motion, explaining: "Based on the responses and the Court's observation, I did find a prima facie basis for the motion. However, upon hearing the reasons and then examining it, in comparison with the questionnaire, there does appear to be a nonracial reason for various reasons for excusing [D.R.] from a prosecutor's prospective."

## B. Analysis

The applicable legal principles in evaluating a *Batson/Wheeler* motion are well settled. "First, the *Batson/Wheeler* movant must demonstrate a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.... [¶] Second, if the court finds the movant meets the threshold for demonstrating a prima facie case, the burden shifts to the opponent of the motion to give an adequate nondiscriminatory explanation for the challenges.... [¶] Third, if the opponent indeed tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination. [Citation.]" [Citations omitted.]

We "review the trial court's denial of a *Batson/Wheeler* motion deferentially, considering only whether substantial evidence supports its conclusions. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 341, 60 Cal.Rptr.3d 209, 160 P.3d 84.) "Where it is unclear whether the trial court applied the correct standard, we review the record independently to 'apply the [correct] standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis. [Citations.]" [Citation omitted.] Defendant urges us to review the trial record under the de novo standard. We decline to do so where, as here, the record shows the "trial court met its obligations to make ' ' "a sincere and reasoned attempt to evaluate the prosecutor's explanation" ' and 'clearly express its findings.' [Citation.]" (*Gutierrez, supra*, 2 Cal.5th at p. 1175.) In all events, even if de novo review is appropriate, we would conclude the prosecutor's reasons for excusing D.R. were race-neutral, and not shown to be pretextual. To fully evaluate defendant's contentions on appeal, we find it appropriate to address both the second and third stages of the *Batson/Wheeler* analysis.

At the second stage of the *Batson/Wheeler* analysis, we evaluate whether the prosecutor "has offered a neutral basis—one not based on race, ethnicity, or similar grounds—for subjecting particular prospective jurors to peremptory challenge." (*Gutierrez, supra*, 2 Cal.5th at p. 1158.) "[W]e are mindful that ' "[u]nless a discriminatory intent is inherent in the prosecutor's explanation," ' the reason will be deemed neutral. [Citation.]" (*Ibid.*) Our review of the record here reflects the prosecutor's stated reasons for excusing D.R. were race-neutral: D.R.'s occupation as a registered nurse at a

27

CDCR facility; her stated belief that the criminal justice system could be "very" unfair at times; her hope that "all the facts possible are revealed" as she knew, from working at the CDCR, that the "Innocent Project" had successfully set free some inmates who were wrongly convicted; she had opinions or feelings that might make it "not impossible, but perhaps challenging depending on the facts provided," to judge if someone is guilty or not guilty; she had an unpleasant experience with law enforcement; and she personally knew one potential witness and heard of another potential witness. (*See, e.g.*, *J.E.B. v. Alabama ex. rel. T.B.* (1994) 511 U.S. 127, 142, fn. 14, 114 S.Ct. 1419, 128 L.Ed.2d 89 [peremptory challenge may be based on prospective juror's occupation]; *Gutierrez*, *supra*, 2 Cal.5th at p. 1171 ["a peremptory challenge may be based on a broad range of factors indicative of juror partiality, even those which are ' "apparently trivial" ' or ' "highly speculative" ' "]; *People v. Montes* (2014) 58 Cal.4th 809, 855, 169 Cal.Rptr.3d 279, 320 P.3d 729 [peremptory challenge may be based on prospective juror's negative experience with law enforcement]; *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386, 72 Cal.Rptr.3d 300 (*Calvin* ) [peremptory challenge may be based on prospective juror's "skepticism about the fairness of the criminal justice system"].)[fn 11]

Having determined the prosecutor's reasons for excusing D.R. were race-neutral, we move to the third stage of the analysis of the *Batson/Wheeler* motion, namely, whether defendant has demonstrated "purposeful discrimination. [Citation.] In order to prevail [at this third stage,] the movant must show it was ' "more likely than not that the challenge was improperly motivated." ' [ (*Mai*, *supra*, 57 Cal.4th at p. 1059, 161 Cal.Rptr.3d 1, 305 P.3d 1175.) ] This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. [Citation.] [And,] ... the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, ' "among other factors, ... how reasonable, or how improbable, the explanations are; and ... whether the proffered rationale has some basis in accepted trial strategy." ' [Citation.]" (*Gutierrez*, *supra*, 2 Cal.5th at pp. 1158–1159.) As we now discuss, we conclude defendant has not shown the prosecutor's reasons for excusing D.R. were pretextual.

> 1. *Prosecutor's reliance on D.R.'s profession as a registered nurse in a CDCR facility*

Defendant challenges the prosecutor's reliance on D.R.'s profession as a registered nurse in a CDCR facility. In support of his contention, he asserts that (1) the prosecutor accepted Juror No. 6, a non-African American man, who indicated he was currently employed on a full-time basis as "Xray Tech" "contractor" in a local jail, and he was "[c]urrently—Xray Tech/Pt Care Specialist;" and (2) there were only "minor factors" otherwise distinguishing D.R. from Juror No. 6. We find the argument unavailing. The prosecutor excused D.R., explaining that her work put her in contact with state prisoners on a regular basis that might make her more sympathetic to a defendant who potentially faced the possibility of going to state prison. The prosecutor's expressed reservation about having a person who

worked in a state prison facility serving as a juror "also had ' " 'some basis in accepted trial strategy' " ' [citation] insofar as it stemmed from a concern about the general attitudes and philosophies persons [working in a state prison facility in regular contact with prisoners] might harbor." (*Mai*, *supra*, 57 Cal.4th at pp. 1047, 1053, 161 Cal.Rptr.3d 1, 305 P.3d 1175 [court upheld prosecutor's peremptory challenge excusing juror who worked as social worker where prosecutor expressed, "I generally try not to have social workers. I generally use a peremptory on social workers unless there is a reason not to"].) Additionally, our review of the questionnaires evidences substantive differences between D.R. and Juror No. 6 that distinguish the two jurors. First, unlike D.R., Juror No. 6 stated he thought the criminal justice system was fair and he believed "in general [the criminal justice system] works well." Second, Juror No. 6's work in a local jail, as explained in his questionnaire, reflected that his work was both quantitatively (spent less time with prisoners) and qualitatively (performing X-rays) distinct from the work being performed by D.R. in a CDCR facility. Accordingly, we find the record does not demonstrate the prosecutor's reason for excusing D.R. on the basis of her work in a CDCR facility was pretextual.

### 2. Prosecutor's reliance on D.R.'s Written Response to Question No. 25

Defendant challenges, on several grounds, the prosecutor's reliance on D.R.'s written response to Question No. 25.[fn 12] According to defendant, the prosecutor misstated D.R.'s response to the question by representing to the trial court that D.R. was the only juror who wrote the criminal justice system was "very" unfair without noting she had clarified her written response by adding the words "at times." In addition, defendant argues the prosecutor accepted Juror No. 10 and Alternate Juror B, who gave responses that were more negative than D.R. regarding the fairness of the criminal justice system. Again, we disagree. The record shows the prosecutor referred in his argument to the court the exact language used by D.R. in her written response to Question No. 25. Moreover, a comparison of the jurors' written responses does not demonstrate that the prosecutor's reliance on D.R.'s written response to Question No. 25 was racially motivated where, as here, the questionnaires indicate there were substantive differences distinguishing D.R. from Juror No. 10 and Alternate Juror B. For example, unlike D.R., Juror No. 10 believed the criminal justice system made it too hard for prosecutors to convict people accused of crimes and he would favor the side that had law enforcement witnesses because "most law enforcement officers are trustworthy." In addition, unlike D.R., Alternate Juror B indicated he had no experience which might affect his ability or cause him any concern about his ability to serve fairly as a juror in a murder case and he had no opinions or feelings which made it difficult or impossible for him to find someone guilty or not guilty of a crime. Accordingly, we find the record does not demonstrate the prosecutor's reason for excusing D.R. on the basis of her written response to Question No. 25 was pretextual.

////

29

*3. Prosecutor's reliance on D.R.'s written response to Question No. 40*

Defendant challenges the prosecutor's reliance on D.R.'s description of an unpleasant experience with law enforcement in her written response to Question No. 40. [fn 13] He argues the prosecutor accepted several non-African American jurors (Juror No. 6, Juror No. 9, Juror No. 10, Alternate Juror A, Alternate Juror B), who also described an unpleasant experience with law enforcement. We have already referenced the differences distinguishing D.R. from Juror No. 6, Juror No. 10, and Alternate Juror B. In addition, our review of the questionnaires indicates there were substantive differences distinguishing D.R. from Juror No. 9 and Alternate Juror A. Juror No. 9 affirmatively indicated the criminal justice system was fair and she believed the criminal justice system made it too hard for prosecutors to convict people accused of crimes "because there sometimes [is] crucial evidence that for whatever reason can't be used in court." Likewise, Alternate Juror A indicated he believed the criminal justice system was fair and the criminal justice system made it too hard for prosecutors to convict people accused of crimes. [fn 14] Accordingly, we find the record does not demonstrate the prosecutor's reason for excusing D.R. on the basis of her unpleasant experience with law enforcement was pretextual.

*4. Prosecutor's reliance on D.R.'s written responses to Question No. 57 and Question No. 63*

Defendant challenges the prosecutor's reliance on D.R.'s written responses to Question No. 57[fn 15] and Question No. 63[fn 16]. He contends neither D.R.'s written responses nor her voir dire responses support the prosecutor's inference that D.R. actually meant she wanted the case proved "beyond all reasonable doubt." Defendant also argues the trial court properly rejected the prosecutor's reliance on D.R.'s mention of the Innocence Project as a basis to excuse her as a juror. [fn 17] We find these arguments unavailing. While it is true D.R. never "referenced reasonable doubt" in her written responses, she "singled herself out with a cryptic answer that called into question her ability to fulfill her obligations as a juror." (*United States v. White* (7th Cir. 2005) 416 F.3d 634, 641.) We find it "understandable that the [prosecutor] might have been concerned whether a juror who [gave those responses] would be able to apply [the reasonable doubt] standard," and not unreasonable "for the [prosecutor] to be anxious about someone who volunteers that her attitudes and preconceptions might affect her performance in the jury room." (*Ibid.*; *see Id.* at pp. 640–641 [court upheld peremptory challenge to the only prospective juror who responded to a question as to whether she had any "preconceptions or attitudes" about jury duty, the American legal system, the courts, its officers, and attorneys that would affect her ability to serve as juror, with more than a simple "no," and, wrote that " 'she was a very conservative person, and that she tended not to see things in great perceptions' "].) Nor do we see anything suspect in the prosecutor's reliance on D.R.'s reference to the Innocence Project in her written response to Question No. 57. The prosecutor explained that his concern arose from D.R.'s reference to the Innocence Project accompanied by her

30

expression of "hope" that "all the facts would be revealed" at trial. Based on D.R.'s written statements, in context, the prosecutor could reasonably be concerned that D.R. might not follow the reasonable doubt standard, despite her statements during voir dire that she would not hold the prosecutor to a higher standard than proof beyond a reasonable doubt. (*See People v. Manibusan* (2013) 58 Cal.4th 40, 84, 165 Cal.Rptr.3d 1, 314 P.3d 1 [prospective juror "after indicating on her questionnaire that she would consider the death penalty, she explained that the 'death penalty <u>must really</u> be warranted,' and that she held this view because she had 'heard instances on television where [the] death penalty was warranted but later found out [the defendant] was innocent due to certain evidence not looked into.' (Original underscoring.) The prosecution could have been concerned about [the answer] notwithstanding the prospective juror's subsequent acknowledgement during voir dire that she would follow the reasonable doubt standard and would not require anything greater of the prosecution"].) Accordingly, we find the record does not demonstrate the prosecutor's reasons for excusing D.R. on the basis of her written responses to Question No. 57 and Question No. 63 were pretextual.

>    5. *Prosecutor's reliance on D.R.'s written response to Question No. 77*

Defendant challenges the prosecutor's reliance on D.R.'s written response to Question No. 77 as to her personal knowledge of one prospective witness (L.B.) and what she had heard about another prospective witness (C.T.).[fn 18] He contends the prosecutor mischaracterized or took out of context D.R.'s written response to Question No. 77. He also contends the trial court rejected the prosecutor's reliance on D.R.'s written response regarding C.T. as a valid race-neutral reason to excuse D.R.[fn 19] However, the record shows the prosecutor neither mischaracterized nor took out of context D.R.'s written response to Question No. 77. Nor do we find the trial court's comments regarding the prosecutor's explanation for excusing D.R. based on her knowledge about C.T. reflected an express or implied finding of pretext as defendant suggests. Accordingly, we find the record does not demonstrate the prosecutor's reason for excusing D.R. on the ground she personally knew one prospective witness and she heard of another prospective witness was pretextual.

Finally, in evaluating defendant's *Batson/Wheeler* challenge, we must "also consider comparisons" between D.R. and prospective jurors "of other races who were allowed to serve. [Citation.] 'The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]' [Citation.] 'If a prosecutor's proffered reason for striking [an African–American] panelist applies just as well to an otherwise-similar [non-African American] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at [the] third step.' [Citation.] 'At the same time, "we are mindful that comparative juror analysis on a cold

31

appellate record has inherent limitations." [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]' [Citation.]" (*Winbush*, *supra*, 2 Cal.5th at p. 442.) Thus, "a defendant must engage in a careful side-by-side comparative analysis to demonstrate that the dismissed and retained jurors were 'similarly situated.' [Citation]" (*Calvin*, *supra*, 159 Cal.App.4th at p. 1389, fn. 4, 72 Cal.Rptr.3d 300.) In this case, defendant does not give us a side-by-side comparison analysis between D.R. and all the seated jurors. Instead, he argues that some of the prosecutor's reasons for excusing D.R. were racially motivated because certain non-African–American jurors (Juror No. 6, Juror No. 9, Juror No. 10, Alternate Juror A and Alternate Juror B), who expressed similar views on some questions, were not excused. (*Winbush*, *supra*, 2 Cal.5th at p. 443.) Thus, we limit our focus to the questionnaire responses of those jurors who have been identified by defendant in his claim of disparate treatment. (*Id.* at pp. 442–443.)

We have reviewed the record and conducted the required comparative analysis, and find defendant has not demonstrated discriminatory pretext on the part of the prosecutor. A comparison of the questionnaires indicates that unlike D.R.'s written answers to Question No. 57, Question No. 63, and Question No. 77, as discussed above, the seated jurors in question (Juror No. 6, Juror No. 9, Juror No. 10, Alternate Juror A and Alternate Juror B), responded they had no experience which might affect their ability or cause them to have any concern about their ability to serve fairly as a juror in a murder case, they had no opinions or feelings which made it difficult or impossible for them to find someone guilty or not guilty of a crime, and they had no knowledge of any prospective witnesses.

In sum, we conclude the record supports the trial court's denial of defendant's Batson/Wheeler motion. Defendant has not shown the prosecutor's stated reasons for excusing D.R. were pretextual.

[fn 11] Because we find the prosecutor's reasons for excusing D.R. were race-neutral, we decline defendant's entreaty to evaluate his *Batson/Wheeler* challenge under the mixed motive standard applicable where a prosecutor gives both race-neutral and race-based reasons for a challenge. [Citation omitted.]

[fn 12] Question No. 25 asked "Do you have any strong feelings about the criminal justice system?" D.R. placed a question mark next to the question, indicating she did not understand the question, and then she wrote: "Can be very unfair @ times." During voir dire, when the prosecutor asked if her written response to Question No. 25 was true, D.R.

confirmed, "It can be. I think it can be unfair. Being employed where I'm employed, and sometimes there's cases that may seem similar, but then maybe that's part because I'm not here, so I don't know. Where say if there's two DUIs and one person gets one penalty and another person gets another penalty. I'm not there, so I'm not then hearing all the facts. Here I would be listening to all the facts that are available, as well as the testimony."

[fn 13] Question No. 40, asked prospective jurors if they had and to describe "an unpleasant experience" involving law enforcement. D.R. responded, "Yes," and then described an "unpleasant" experience in the following manner: "Attempted to stop a police car passing me ... to report a burned out vehicle in the middle of the intersection (he just passed and appeared to look at) [.] He yelled at the top of his lungs & told me next time he'd arrest me." During voir dire, D.R. stated that during the incident she felt like she was being a pest to the officer but she had set aside the experience and would not hold it against the trial prosecutor or any other Vallejo Police Department officers.

[fn 14] In a footnote in his opening and reply briefs, defendant also asks us to draw some significance from the fact that D.R. described only one, and not many unpleasant experiences with law enforcement, claiming that such a circumstance was "extraordinary." We see no merit to defendant's argument. Our review of the questionnaires indicates that none of the seated or alternate jurors described more than one experience in response to the question.

[fn 15] Question No. 57 asked, "This case involves a charge of murder. Is there any experience that you, a family member or close friend have had which may affect your ability or cause you to have any concern about your ability to serve fairly as a juror in a case such as this?" D.R. checked "No," but explained: "Just hope that all the facts possible are revealed. Working for CDCR, I know that the 'Innocent Project' has successfully set some inmates free who were wrongly convicted." (Double underlining in original.)

[fn 16] Question No. 63 asked, "Do you have any opinions or feelings which make it difficult or impossible to judge whether someone is guilty or not guilty of a crime? If so, please explain:" D.R. wrote: "Not impossible, but perhaps challenging depending on facts provided." During voir dire, defense counsel asked D.R. if she felt differently about her written response to Question No. 63, after hearing the voir dire, to which D.R. stated, "I don't think it's impossible. It's just always that there can always be—I guess that's where beyond a reasonable doubt comes into play. It's like, what if there was that one little piece we didn't hear.... All I can go off of is what we have here, which is what I'm supposed to do. [¶] ... [¶] So given the facts at hand, the testimony at hand, that's what my judgment has to come from." The trial

33

prosecutor also asked D.R. to expand on her written response to Question No. 63. She replied: "That just goes along with the type of person that I am. As I said, I'm a Type A personality. So everything that I'm given, I can utilize that testimony as evidence and all of that, but as I said ... you always wonder if there was that one little piece, but that's why it's beyond a reasonable doubt. [¶] ... [¶] So, no, I don't think it would prevent me from giving how I feel at the end—[¶] ... [¶]—one way or the other." The trial prosecutor then queried, "And that standard being proof beyond a reasonable doubt, because it's a murder case, do you think that my burden of proof should be higher, just because ... it's a more serious case than, let's say a DUI or a petty theft, right?" To which D.R. replied, "But still, whatever your burden of proof is is your burden of proof." She would not hold the trial prosecutor to a higher burden of proof than proof beyond a reasonable doubt, "[w]hatever is expected."

[fn 17] When the prosecutor explained his reasons for excusing D.R. based on her written response to Question No. 57, the court interrupted, and stated: "I think you're going a little far with the Innocence Project. That actually has caused a release of innocent people. It's a very, very well-respected group that does very good work. So I'd move off of that argument. [¶] Go ahead. [¶] ... [¶] As a prosecutor, you should, of course, admire groups that protect the innocent." The prosecutor then continued: "I do. I've also dealt with and I know that I've had colleagues where they have pursued cases that were not justified. And so ... I'm just suggesting to the Court that a person ... mentioning that in the form raises a flag for me and I think for any prosecutor."

[fn 18] Question No. 77 asked the prospective jurors to review a list of potential witnesses, to circle any name "you know personally or have heard of," and, indicate "your relationship to any of the potential witnesses or what you have heard about them." D.R. responded, in pertinent part, by circling the name [L.B.] and placing a question mark and check mark next to the name [C.T.]. In the space provided to describe "the nature of your relationship, if any, with the above-listed persons," D.R. indicated the circumstances under which she met L.B., that she and L.B. spoke when they met, and she had heard others speak badly about L.B., but it did not affect her judgment. D.R. heard others speak badly about C.T., but it did not affect her judgment. During voir dire, D.R. explained how she knew L.B., and she explained that she never had any interactions with [C.T.] and had only reported what she had heard about [C.T.] in her written response.

[fn 19] Before rendering its ruling, the court asked the trial prosecutor if C.T. was going to testify. When the trial prosecutor responded that C.T. would not be called as a witness, the court commented, "So the part about [D.R.] having a negative opinion of [C.T.] potentially isn't much of

34

1

2

3

4

> an issue." The trial prosecutor then explained that his point in mentioning D.R.'s response was "[j]ust the fact that she brought up that she had this information." To which the court replied D.R. had responded to the question because C.T. was listed as a prospective witness and D.R. did not know C.T. was not going to testify at trial.

5    Walker, 2017 WL 4325339, at *4-10.

6       **C. Analysis**

7       The analysis of petitioner's Batson claim hangs on the third factor:  whether petitioner has

8  shown the prosecutor was purposely discriminatory when he struck D.R. from the jury venire.

9  The trial court determined that the prosecutor had credible, non-race reasons for striking D.R. and

10 petitioner had not shown them to be pretextual.  The Court of Appeal upheld that determination.

11 The question for this court, then, is whether the Court of Appeal "was objectively unreasonable in

12 concluding that [the] trial court's credibility determination was supported by substantial

13 evidence." Briggs, 682 F.3d at 1170.  In examining that question, this court is mindful that it

14 "must defer to [the trial court's] credibility and factual findings."  Id. at 1171; see also Miller-El,

15 545 U.S. at 240.  And, it is petitioner's burden to disprove those factual findings.  Briggs, 632

16 F.3d at 1171 (citing 28 U.S.C. § 2254(e)(1)).

17      The Supreme Court has instructed that a "side-by-side comparison[]" of stricken black

18 venire members with white jurors can show that the "proffered reason for striking a black panelist

19 applies just as well to an otherwise-similar nonblack who is permitted to serve."  Miller-El, 545

20 U.S. at 241.  That evidence tends "to prove purposeful discrimination to be considered at

21 Batson's third step."  Id.  Petitioner compares D.R.'s responses to responses to the same questions

22 by jurors.  What petitioner does not do is consider whether those nonblack jurors were "otherwise

23 similar."  Wholistic consideration of each venire member's written answers and responses to voir

24 dire shows that those chosen jurors were not similar in important respects.  The Court of Appeal

25 concluded, and this court agrees, that, when compared to the nonblack jurors, the totality of the

26 prosecutor's reasons for striking D.R. do not demonstrate that the prosecutor's reasons were

27 pretextual.

28 ////

The prosecutor stated the following reasons for striking D.R. from the venire:

(1) Her job as a nurse at a California prison.

(2) Her statement in her questionnaire that the justice system can be "very unfair at times."

(3) D.R.'s "unpleasant experience with law enforcement." She explained in response to question 40 on her questionnaire: "Attempted to stop a police car passing me on the corner of Whitney & Basalt to report a burned out vehicle in the middle of the intersection (he just passed and appeared to look at). He yelled at the top of his lungs & told me next time he'd arrest me."

(4) While D.R. responded that she did not have any experiences that would affect her ability to serve as a juror, she provided an explanation. She stated: "Just hope that all the facts possible are revealed. Working for CDCR, I know that the 'Innocent Project' has successfully set some inmates free who were wrongly convicted."

(5) D.R.'s statement that she might find it difficult to judge someone's guilt "depending on the facts."

(6) The fact D.R. had heard that a potential witnesses, a police officer, was "very unfair" and "abuses his authority."

(2 RT 290-92 (ECF No. 19-3 at 309-11); Ex. 3 (ECF No. 22 at 9-21).[4])

During voir dire, D.R. testified that she would not hold her negative experience with a police officer against the prosecution. (RT 238 (ECF No. 19-3 at 250).) She also reiterated a concern that there might be "one little piece" of evidence that the jury would not be provided. (Id. at 241, 252.) But, she recognized that she must consider the evidence presented. In response to the prosecutor's question regarding D.R.'s statement that she felt the justice system can be "very unfair," she stated that she felt it "can be unfair. Being employed where I'm employed, and sometimes there's cases that may seem similar, but then maybe that's part because I'm not there, so I don't know." (Id. at 251.)

---

[4] Exhibits 3 and 4 are the juror questionnaires. This court granted respondent's motion to submit them under seal because they contain personal identifying information. (ECF Nos. 20, 21.) Herein, this court describes only information from those questionnaires that would not identify those jurors or venire members and/or was raised in their public voir dire testimony.

1    D.R.'s questionnaire and testimony during voir dire show that her work put her in regular,

2    personal contact with inmates.  She expressed concern about the justice system in several ways –

3    she mentioned the work of the Innocence Project; she stated that she felt the justice system could

4    sometimes be very unfair; and she included a comment that she hoped all facts would be revealed

5    at trial, indicating she had concerns about the withholding of relevant evidence from jurors.

6    To show that the prosecutor's reasons were pretextual, petitioner compares D.R. to the

7    following jurors:  Juror No. 6, Juror No. 9, Juror No. 10, Alternate Juror A and Alternate Juror B.

8    Juror No. 6 was an X-ray technician, who had done some contract work for a county jail

9    as an X-ray technician and "patient care specialist."  Juror No. 6 did not have strong feelings

10   about the criminal justice system (question #25), did not have any experiences that would cause

11   concern about his ability to serve fairly (question #57), expressed no concern about judging

12   someone's guilt (question #63), and knew none of the potential witnesses (question #77).  (Ex. 3

13   (ECF No. 22 at 126, 134, 135, 137).)  Juror No. 6 did list an unpleasant experience with law

14   enforcement – "Ticketed, even though sitting in car and about to move."  (Id. at 130) (question

15   40).)  When questioned during voir dire, Juror No. 6 answered questions regarding helping his

16   nephew seek to remove a restraining order from his record. (RT 318-20  (ECF No. 19-3 at 337-

17   39).)  Juror No. 6 testified that he felt the system treated his nephew fairly.

18   Juror No. 9 was a corporate receptionist.  Juror No. 9's answers to the relevant questions

19   were similar to Juror No. 6's answers.  Juror No. 9 also expressed no reservations about being

20   able to serve fairly.  And, like Juror No. 6, Juror No. 9 had had one unpleasant experience with

21   law enforcement involving a traffic ticket.  (Ex. 3 (ECF No. 22 at 177-95).)  During voir dire, the

22   prosecutor asked Juror No. 9 no follow-up or other questions.  (RT 364 (ECF No. 19-3 at 383).)

23   Juror No. 10 was a project manager for a gas company.   Like Juror Nos. 6 and 9, Juror

24   No. 10 raised no issues about his ability to be fair and stated one unpleasant experience with law

25   enforcement.  He wrote, "pull over for tinted windows and treated me as I was a criminal."  (Ex. 3

26   (ECF No. 22 at 196-214).)  In voir dire, Juror No. 10 stated that he received a ticket, which he did

27   not challenge, for the tinted windows.  He stated he did not have a problem with the incident.  He

28   commented that "[i]t's common."  (RT 249 (ECF No. 19-3 at 261).)

1   Alternate Juror A worked in receiving for a hardware store.  He expressed no reservations

2   about being able to be fair.  His one unpleasant experience with law enforcement was "I got a

3   DUI."  In addition, when asked whether any family member had been convicted of a crime, he

4   stated, "I have two dui's and so does my father."  (Ex. 3 (ECF No. 22 at 253-71).)  During voir

5   dire, Juror A testified that he had once been arrested and did not feel he was treated fairly.  (RT

6   414-15 (ECF No. 19-3 at 438-39).)  The charges were dismissed when he agreed to a diversion

7   program.  Juror A did indicate in answers to questions that he might be more willing to believe a

8   law enforcement officer than a person accused of a crime.  (Id. at 421.)

9   Finally, alternate Juror B worked as a psychiatric nurse at a medical center.  In response to

10  question #25, whether he had strong feelings about the criminal justice system, he checked "yes"

11  and, in response to the following question, stated that he did not feel it was fair.  Juror B also

12  listed an unpleasant experience with law enforcement.  It was "personal problem where I don't

13  believe that I was listened to[], they just assumed."  He also responded that he had been

14  interviewed by the police and "did not feel the interview was fair because of the fact that the

15  police already made a decision."  In response to question 53, he described a domestic case and

16  that the person involved "did a domestic violence program then charges dropped."  (Id. at 272-

17  290.)

18  In voir dire, Juror B corrected one response to point out that he had two DUIs about thirty

19  years ago.  Juror B then explained the answer to the question regarding his feelings about the

20  justice system.  He testified that he was arrested in a "domestic case" and did not feel he was

21  treated fairly by either the police or the court.  (RT 426, 428-29 (ECF No. 19-3 at 452, 455-56).)

22  The case was dismissed when Juror B agreed to a diversion program.  (Id. at 428.)  However,

23  Juror B also testified that he would not hold those feelings against the police in this case.  In

24  addition, he testified that he had some former and current family members who work in the prison

25  system.  (Id. at 427.)  The prosecutor questioned Juror B about whether he might subconsciously

26  have bad feelings against the police or prosecutors.  Juror B testified that he did not believe he

27  would.  (Id. at 429.)

28  ////

Looking at each of these jurors in comparison to D.R., none had the combination of factors that would, reasonably, have given the prosecutor more cause for concern.  D.R. had regular and personal contact with prison inmates in her job; and she seemed to feel that all evidence, including evidence that might exculpate the defendant, might not be revealed at trial. Further, D.R. expressed concern about the justice system based on her interactions with prisoners.

The only juror with anything close to the number of red flags that D.R. had was Alternate Juror B.  Yet, while that alternate juror had negative experiences with law enforcement and the justice system, he did not have the regular contact with prisoners and their stories that D.R. had. The prosecutor could reasonably have felt that D.R.'s broad statements about unfairness in the justice system were potentially more damaging to the prosecution than someone who had one, isolated bad experience with that system.  As explained thoroughly by the Court of Appeal, none of the other jurors had anything close to the number and kind of causes for concern that D.R. did.

The California Court of Appeal correctly applied the <u>Batson</u> standards.  This court finds no grounds for a determination that the California Court of Appeal's decision was contrary to or an unreasonable application of clearly established federal law.  Petitioner's <u>Batson</u> claim should fail.

**CONCLUSION**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In the objections, the party may address whether a certificate of appealability should issue in the event

39

an appeal of the judgment in this case is filed.  See Rule 11, Rules Governing § 2254 Cases (the

district court must issue or deny a certificate of appealability when it enters a final order adverse

to the applicant).

Dated:  May 6, 2020

_____

DEBORAH BARNES

UNITED STATES MAGISTRATE JUDGE

DLB:9
DB/prisoner-habeas/walk2492.fr